# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **AUDREY GALLMANN, individually** | * | |
| **and on behalf of all similarly situated,** | * | |
| | * | |
| *Plaintiff,* | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 18-587** |
| | * | |
| **OWENS COLLISION AND** | * | **JUDGE** |
| **SERVICE CENTER, LLC,** | * | |
| **ALLSTAR AFFORDABLE AUTOS, LLC,** | * | **MAGISTRATE** |
| **ALLSTAR WHOLESALE AUTO'S, LLC,** | * | |
| **ALLSTAR COLLISION MAX, LLC,** | * | |
| **COLLISION MAX, LLC,** | * | |
| **ALLSTAR VENTURES, LLC,** | * | |
| **ALLSTAR HOLDINGS, LLC,** | * | |
| **GLO INVESTMENTS, LLC,** | * | |
| **GREGORY L. OWENS, AND** | * | |
| **DEVON STEPHENS,** | * | |
| | * | |
| *Defendants.* | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**NOW INTO COURT,** through undersigned counsel, comes Plaintiff, Audrey Gallmann, individually and on behalf of all similarly situated, who respectfully files this Class Action Complaint and Demand for Jury Trial against the following ten named Defendants: (1) Owens Collision and Service Center, LLC, (2) Allstar Affordable Autos, LLC, (3) Allstar Wholesale Auto's, LLC, (4) Allstar Collision Max, LLC, (5) Collision Max, LLC, (6) Allstar Ventures, LLC, (7) Allstar Holdings, LLC, (8) GLO Investments, LLC, (9) Gregory L. Owens, and (10) Devon Stephens, as follows:

## PARTIES

1. Plaintiff, Audrey Gallmann ("Ms. Gallmann"), is an individual of the age of majority, domiciled in the Parish of East Baton Rouge, State of Louisiana.

2. Defendant, Owens Collision and Service Center, LLC ("OCSC"), is a Louisiana limited liability company with its principal place of business located in the Parish of East Baton Rouge, State of Louisiana.

3. Defendant, Allstar Affordable Autos, LLC ("Allstar Affordable Autos"), is a Louisiana limited liability company with its principal place of business located in the Parish of East Baton Rouge, State of Louisiana.

4. Defendant, Allstar Wholesale Auto's, LLC ("Allstar Wholesale Auto's"), is a Louisiana limited liability company with its principal place of business located in the Parish of East Baton Rouge, State of Louisiana.

5. Defendant, Allstar Collision Max, LLC ("Allstar Collision"), is a Louisiana limited liability company with its principal place of business located in the Parish of East Baton Rouge, State of Louisiana.

6. Defendant, Collision Max, LLC ("Collision Max"), is a Louisiana limited liability company with its principal place of business located in the Parish of East Baton Rouge, State of Louisiana.

7. Defendant, Allstar Ventures, LLC ("Allstar Ventures"), is a Louisiana limited liability company with its principal place of business located in the Parish of East Baton Rouge, State of Louisiana.

8. Defendant, Allstar Holdings, LLC ("Allstar Holdings"), is a Louisiana limited liability company with its principal place of business located in the Parish of East Baton Rouge, State

of Louisiana.

9. Defendant, GLO Investments, LLC ("GLO Investments"), is a Louisiana limited liability company with its principal place of business located in the Parish of East Baton Rouge, State of Louisiana.

10. All Defendant-entities will be collectively referred to herein as the "Owens Entities."[1]

11. Defendant and RICO Defendant, Gregory L. Owens ("Owens"), is an individual of the age of majority, residing in the Parish of East Baton Rouge, State of Louisiana. Owens solely owns and operates, either individually or through his ownership in other companies, all of the Owens Entities.

12. Defendant and RICO Defendant, Devon Stephens ("Stephens"), is an individual of the age of majority, residing in the Parish of East Baton Rouge, State of Louisiana, and, upon information and belief, was an employee and/or agent of OCSC during all times relevant to this Complaint.

## JURISDICTION AND VENUE

13. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as Counts I and II arise out of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and pursuant to RICO's civil damages provision, 18 U.S.C. § 1964(c). There is supplemental jurisdiction over the remaining state law counts as they arise from the same set of facts.

14. Venue is proper in the Middle District of Louisiana as all parties are domiciled and employed in this District, and the wrongful actions giving rise to the causes of action in this Complaint occurred in this District.

---

[1] As detailed below, Defendants identified in Paragraphs 2-9 are not defendants in the RICO claims, but are instead the enterprises in the RICO claim(s). However, Defendants identified in Paragraphs 2-9 are defendants in one or more of the state law claims.

## FACTUAL ALLEGATIONS

### THE RELATIONSHIP BETWEEN
### OWENS, STEPHENS, AND THE OWENS ENTITIES

15. Upon information and belief, Owens is the sole member of three (3) Louisiana business entities: OCSC, Allstar Collision, GLO Investments.

16. OCSC provides predominately collision repair and vehicle maintenance services, including insurance claim assistance, and conducts business out of its principal place of business located at 12525 Jefferson Highway in Baton Rouge, Louisiana.

17. Upon information and belief, OCSC employs Stephens as the manager of OCSC responsible for the day-to-day operations of the business which includes duties such as communicating directly with customers and negotiating payments from insurance companies.

18.  OCSC provides insurance claim assistance which entails OCSC communicating directly with its customers' insurance companies to negotiate payments for collision repair and maintenance services.

19. Upon information and belief, Owens and/or Stephens communicates directly with its customers' insurance companies on behalf of OCSC to negotiate insurance payments for collision repairs.

20. Upon information and belief, Owens' second business entity, Allstar Collision, provides, or has provided in the past, services similar to OCSC, and conducts business out of its principal place of business located in Baton Rouge, Louisiana.

21. Owens' third business entity, GLO Investments, operates out of its principal place of business located at the same address as OCSC—12525 Jefferson Highway.

22. Upon information and belief, GLO Investments is the sole member of two (2) Louisiana business entities: Collision Max and Allstar Holdings.

4

23. Both Collision Max and Allstar Holdings operate out of their principal place of business located at the same address as OCSC—12525 Jefferson Highway.

24. Upon information and belief, Allstar Holdings is the sole member of two (2) Louisiana business entities: Allstar Affordable Autos and Allstar Ventures.

25. Upon information and belief, Allstar Holdings' first business entity, Allstar Affordable Autos, buys and sells used cars out of its principal place of business located next door, or at least near, to OCSC at 12545 Jefferson Highway.

26. Allstar Holdings' second business entity, Allstar Ventures, operates out of its principal place of business located in Baton Rouge, Louisiana and, upon information and belief, is the sole member of Allstar Wholesale Auto's.

27. Upon information and belief, Allstar Wholesale Auto's buys and sells wholesale vehicles out of its principal place of business located next door, at least near, to OCSC at 12565.

### OWENS' AND STEPHENS' SCHEME TO DEFRAUD

28. In January 2018, Ms. Gallmann was involved in a motor vehicle accident which caused damage to her 2011 Toyota Camry (the "vehicle").

29. On or about January 29, 2018, Ms. Gallmann drove the vehicle to OCSC to obtain an estimate for the cost to repair the vehicle.

30. Ms. Gallmann's vehicle was in drivable condition when she left it with OCSC.

31. Others are in similarly situated positions in that they brought their drivable vehicles to OCSC.

32. Neither Ms. Gallmann nor anyone on behalf of Ms. Gallman authorized, either in writing or verbally, OCSC to perform repairs on her vehicle.

33. Others are in similarly situated positions in that they did not authorize OCSC to perform repairs on their vehicles.

34. On or about February 5, 2018, Ms. Gallmann received a check for $1,433.58 from The Allstate Corporation (a/k/a Allstate Insurance) for the estimated cost of repairing the vehicle.

35. Upon information and belief, OCSC received a copy of Allstate Insurance's first estimate via U.S. Mail from Allstate Insurance.

36. Allstate Insurance is a Delaware corporation operating its principal place of business in Illinois and it provides insurance services throughout the United States, including in the State of Louisiana.

37. After receiving the estimate check, Allstate Insurance performed a second estimate on or about February 9, 2018, and subsequently sent Ms. Gallmann a second check for $1,718.29 to cover the repair costs, which Ms. Gallmann received on or about February 12, 2018.

38. In total, Allstate Insurance estimated the cost to repair Ms. Gallmann's vehicle would be approximately $3,151.87.

39. In mid-February 2018, Ms. Gallmann's son, Jimmy Gallmann, went to OCSC to discuss the vehicle estimate and possible repairs on behalf of Ms. Gallmann.

40. At OCSC, Stephens represented to Jimmy Gallmann that the estimated cost to repair Ms. Gallmann's vehicle would be approximately $6,200.00—almost double the amount of Allstate Insurance's estimate.

41. Stephens asked Jimmy Gallmann if he could get a check from Ms. Gallmann for the additional $3,048.13 to cover OCSC's inflated estimate.

42. Jimmy Gallmann represented to Stephens that Ms. Gallmann did not agree to pay more for the repairs than estimated by Allstate Insurance.

43. Stephens then represented to Jimmy Gallmann that OCSC could repair the vehicle without the additional money, but that OCSC would have to do a "budget repair" instead using admittedly

6

substandard auto parts. Stephens informed Jimmy Gallmann that if OCSC performed a "budget repair," OCSC could not guarantee the quality of the repairs.

44. Jimmy Gallmann informed Stephens that Ms. Gallmann did not agree to or authorize OCSC to perform the "budget repair" on her vehicle.

45. In response, Stephens represented to Jimmy Gallmann that she would "work on the numbers" and contact Ms. Gallmann at a later date about the repair estimate.

46. Upon information and belief, OCSC, through Stephens and/or Owens, contacted Allstate Insurance to negotiate an additional payment to cover OCSC's repair $6,200.00 estimate.

47. Allstate Insurance only agreed to give Ms. Gallmann an additional $150.00 for the vehicle repair.

48. Between mid-February and early-March 2018, Ms. Gallmann contacted OCSC via telephone on at least two separate occasions to ascertain the status of her vehicle, but each time Stephens rushed Ms. Gallmann off the phone and refused to give her an update on the status of her vehicle.

49. On or about March 6, 2018, Ms. Gallmann's daughter, Gail Gallmann Mackey, contacted OCSC via telephone to obtain an update on the vehicle on behalf of Ms. Gallmann.

50. Upon information and belief, Stephens misrepresented to Gail Gallmann Mackey that OCSC had only just recently received Allstate Insurance's second estimate in the mail from Allstate Insurance even though Allstate Insurance performed its second estimate approximately one-month prior, on February 9, 2018, and Ms. Gallmann received the second estimate check on February 12, 2018.

51. During the phone call, Stephens also reiterated to Gail Gallmann Mackey that since Allstate Insurance would not pay OCSC's estimated cost of repair ($6,200.00), OCSC would have to

do a "budget repair" instead for $3,151.87 and that the car would "not be fixed 100%" and would "not be fixed right".

52. Gail Gallmann Mackey represented to Stephens a second time that Ms. Gallmann did not agree to or authorize OCSC to perform the "budget repair" and informed Stephens that Ms. Gallmann wanted to come pick up her car from OCSC as soon as possible.

53. In response, Stephens stated that Ms. Gallmann could pick up the car from OCSC but that she would have to pay OCSC for "diagnostic labor, analysis fees, parts, paint, and storage fees." However, Stephens did not provide Gail Gallmann Mackey, Jimmy Gallmann, or Ms. Gallmann with a total amount or an itemized invoice detailing the work allegedly performed as is required by La. R.S. Stat. § 32:1263.

54. Gail Gallmann Mackey informed Stephens that Ms. Gallmann would not pay OCSC's alleged fees because at that time OCSC was only engaged to perform an estimate on the vehicle. Neither Ms. Gallmann nor anyone on behalf of Ms. Gallmann authorized OCSC to perform any repairs on the vehicle.

55. On or about March 8, 2018, Gail Gallmann Mackey and her sister-in-law, Jackie Gallmann, went to OCSC to pick up Ms. Gallmann's vehicle.

56. While at OCSC, Gail Gallmann Mackey and Jackie Gallmann saw Owens and asked him whether he owned OCSC because they wanted to speak to him about Ms. Gallmann's vehicle.

57. Owens intentionally and fraudulently misrepresented to Gail Gallmann Mackey and Jackie Gallmann that he was not the owner of OCSC and that they could only speak with Stephens.

58. Stephens, however, not only refused to give them possession of the vehicle or even let them see the vehicle, but she also refused to discuss any details about the vehicle with them. Instead, Stephens informed them that the file had been sent to OCSC's attorney by "dispatch" and

insisted that that they would have to contact OCSC's attorney to discuss the vehicle, but Stephens refused to provide them with the name of OCSC's alleged attorney.

59. While still at OCSC, Gail Gallmann Mackey then immediately called her daughter, Brennan Mackey Pizzolato, a Louisiana licensed attorney, and placed her on speaker phone with Stephens, at which time Brennan Mackey Pizzolato requested from Stephens the name of OCSC's attorney.

60. Stephens refused to provide Brennan Mackey Pizzolato with the name of OCSC's alleged attorney.

61. Soon thereafter, Gail Gallmann Mackey and Jackie Gallmann went to the Baton Rouge City Police Office to report the incident.

62. Subsequently, a police officer, Lieutenant Lapeyrouse, went to OCSC to inquire about why OCSC refused to give Ms. Gallmann possession of her vehicle.

63. Upon information and belief, Stephens informed Lt. Lapeyrouse that Ms. Gallmann could pick her vehicle up from OCSC the next day along with an invoice, but that she would need a tow truck to pick up the vehicle despite the vehicle being drivable when it was dropped off to OCSC in January 2018.

64. Thereafter, Jimmy Gallmann contacted Allstate Insurance to request than an Allstate Insurance adjuster accompany him to pick up Ms. Gallmann's vehicle.

65. Upon information and belief, the Allstate Insurance adjuster contacted OCSC to schedule an appointment time to pick up the vehicle, at which time Stephens told the Allstate Insurance adjuster that he was not welcome on OCSC's property and that he would have to contact OCSC's attorney. However, Stephens would not provide the Allstate adjuster with the name of OCSC's attorney.

66. Stephens representations to Lt. Lapeyrouse that Ms. Gallmann would be allowed to pick up her vehicle were therefore false and fraudulent.

67. On or about March 9, 2018, Brennan Mackey Pizzolato called OCSC and again asked Stephens for the name of OCSC's alleged attorney. Stephens again refused to provide Brennan Mackey Pizzolato with the name of OCSC's alleged attorney.

68. Ms. Gallmann later discovered, through the website for the Louisiana Secretary of State, that OCSC's registered agent was Ashly Van Earl, a Louisiana licensed attorney.

69. Brennan Mackey Pizzolato called Mr. Van Earl to discuss the OCSC matter.

70. Mr. Van Earl represented to Brennan Mackey Pizzolato that OCSC had not contacted him about the matter and that he had no knowledge of matter.

71. On or about March 15, 2018, Jimmy Gallmann attempted a second time to pick up the vehicle from OCSC, but Stephens again refused to give him possession of the vehicle and instructed him to speak with OCSC's attorney. Once more, however, Stephens refused to tell Jimmy Gallmann the name of OCSC's alleged attorney.

72. Jimmy Gallmann then requested to see an invoice of the costs that OCSC alleged Ms. Gallmann owed for the repairs that OCSC allegedly made to Ms. Gallmann's vehicle and without Ms. Gallmann's authorization.

73. Stephens emailed an invoice of the alleged costs to Jimmy Gallmann on or about the evening of March 16, 2018. The email, however, simply stated the alleged amount due by Ms. Gallmann was $4,911.54 but contained no itemization or description of the work allegedly performed by OCSC to justify or explain the invoice amount, as is required by La. R.S. Stat. § 32:1263.

74. Neither Ms. Gallmann nor anyone on behalf of Ms. Gallmann authorized OCSC to perform

any repairs on the vehicle. In fact, Jimmy Gallmann specifically instructed Stephens on two separate occasions that Ms. Gallmann did not agree to any repairs that would cost more than Allstate Insurance's repair estimate of $3,151.00 and did not agree to OCSC performing a "budget repair" on her vehicle. Gail Gallmann Mackey also specifically instructed Stephens that Ms. Gallmann did not agree to any repairs whatsoever.

75. OCSC was only authorized to provide Ms. Gallmann with an estimate of the cost of repairs and attempt to reach an agreement on the repair cost with Allstate Insurance.

76. Upon information and belief, Owens and/or Stephens stalled or otherwise delayed the repair estimate negotiation process with Ms. Gallmann and/or Allstate Insurance to lengthen the time that OCSC was in possession of Ms. Gallmann's vehicle in order to charge her daily vehicle "storage fees."

77. OCSC has had possession of Ms. Gallmann's vehicle since January 29, 2018.

78. To date, approximately four months since Ms. Gallmann brought her vehicle to OCSC, OCSC still has possession of the vehicle, refuses to return the vehicle to Ms. Gallmann, and continues to charge Ms. Gallmann a daily fee for storing the vehicle.

79. Although OCSC has had possession of Ms. Gallmann's vehicle since January 29, 2018, Ms. Gallmann has continued to maintain auto insurance on the vehicle.

80. As a result of OCSC's refusal to return the vehicle to Ms. Gallmann, Ms. Gallmann had to purchase a new vehicle, as well as an additional auto insurance policy, in lieu of getting a rental because the rental vehicle was more expensive than obtaining a new car note.

81. Upon information and belief, Owens and Stephens devised a scheme to defraud Ms. Gallmann and Allstate Insurance, a foreign corporation, by fraudulently overestimating the cost to repair Ms. Gallmann's vehicle, negotiating with Allstate Insurance for additional payments, and

obtaining, or attempting to obtain, more money from Allstate Insurance than the actual cost to repair Ms. Gallmann's vehicle.

82. When Owens and/or Stephens failed to obtain the total amount of money sought from either Ms. Gallmann or Allstate Insurance, Owens and/or Stephens then, upon information and belief, fabricated fraudulent repair costs allegedly owed by Ms. Gallmann in an attempt to defraud Ms. Gallmann and/or Allstate Insurance out of money not owed to either Owens, Stephens, or OCSC.

83. Defendants' refusal to provide Ms. Gallmann with an itemized list of repairs allegedly performed by OCSC further demonstrates the fraudulent nature of Defendants' scheme, because, upon information and belief, OCSC made no actual repairs and therefore would have no costs to itemize.

84. In the event that OCSC did in fact perform some repairs on Ms. Gallmann's vehicle, those repairs were unauthorized and OCSC is not entitled to any payment for those unauthorized repairs.

85. Upon information and belief, OCSC purposefully stalled its dealings with Ms. Gallmann and is now refusing to give Ms. Gallmann her vehicle to potentially assert a repairman's privilege under LSA-R.S. 9:4501, 9:4502 in the future for the purpose of selling Ms. Gallmann's vehicle through one or more of the Owens Entities to satisfy OCSC's fraudulent invoice.

86. Upon information and belief, Owens and/or Stephens communicated with Allstate Insurance, a foreign corporation, via U.S. Mail, including receiving repair estimates from Allstate Insurance via U.S. Mail, and also via wire communications including telephone, electronic mail, and/or facsimile communications.

87. Upon information and belief, Owens' and/or Stephens' communications with Allstate

Insurance conducted their scheme to defraud across state lines because Allstate Insurance is a non-Louisiana business entity. Thus, their scheme affected interstate commerce.

88. Accordingly, Owens' and/or Stephens' actions violated 18 U.S.C. § 1341, which states, in pertinent part:

> Whoever, having devised . . . any scheme . . . to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations . . . for the purpose of executing such scheme . . . or attempting so to do, places in any post office or authorized depository for mail matter, any matter . . . to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing . . . shall be fined under this title or imprisoned not more than 20 years . . . .

89. Owens' and/or Stephens' actions also violated 18 U.S.C. § 1343, which states, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate . . . commerce, any writings . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years . . . .

90. Upon information and belief, Plaintiff has a good faith basis to believe that Defendants' fraudulent scheme extends beyond this one occurrence and that Defendants have defrauded (and continue to defraud) numerous individuals and nationally-operated insurance companies in a manner similar to the situation described above and that Defendants have been the subject of prior police investigation relating to these other occurrences.

91. Upon information and belief, one or more of the named Defendants are currently being investigated and sued by the State Attorney General's Office in the Parish of East Baton Rouge, State of Louisiana, related to the fraudulent scheme described above.

92. Upon information and belief, OCSC has been the subject of numerous investigations conducted

by the Better Business Bureau, a non-profit organization founded over one-hundred (100) years ago for the purpose of protecting consumers and advancing marketplace trust, in response to complaints made by consumers who have fallen victim to Defendants' fraudulent scheme as described above.

93. As Plaintiff was not a party or privy to Defendants' scheme, the fraudulent communications at issue in this scheme, or any other activities conducted by Defendants at issue, Plaintiff has detailed as much information in this Complaint about the false communications as she currently has, pre-discovery.

## CLASS ALLEGATIONS

94. The preceding paragraphs are incorporated herein as though fully set forth below.

95. Others are similarly situated in that:

   a. They have brought their vehicles to OCSC;

   b. OCSC, through Owens and Stephens, has charged them overblown repairs which they have not authorized and/or refused to pay because they were not agreed to, and/or OCSC, through Owens and Stephens, refused and/or obfuscated the return of their property once they opposed the overblown and illegally assessed charges;

   c. OCSC, through Owens and Stephens, has delayed insurance adjusters in order to charge overblown storage fees for storage of vehicles they refuse to release to potential customers while they perform a purported estimate on vehicles;

   d. OCSC, through Owens and Stephens, has devised a scheme to obtain insurance proceeds in excess of the actual cost to repair vehicles;

   e. Owens, Stephens, and OCSC has further engaged in the types of actions described above.

96. Upon information and belief, Ms. Gallmann's treatment is commonplace business practice for OCSC.

97. Plaintiff and the class she seeks to represent allege violations as listed below on behalf of all persons who brought vehicles to OCSC who were overcharged for repairs and/or charged storage fees.

98. Questions of law and fact common to the class as a whole include, but are not limited to, the following:

   a. Whether Defendants overcharge for repairs;

   b. Whether Defendants cause delay to inflate storage fees;

   c. Whether Defendants make misrepresentations to divert insurance proceeds;

   d. Whether Defendants harmed vehicles to make them non-drivable or less drivable;

   e. Whether Defendants actions caused harm to Plaintiff and the class she seeks to represent;

99. The claims in the below sections are brought as a class action, because Plaintiff's claims are similar to the claims of the members of the prospective class.

100. The questions raised are of common or general interest to the Class, who have a well-defined community of interest in the questions of law and fact raised in this action.

101. Plaintiff's claims are typical of those of the Class, as Plaintiff now suffers from the same violations of law as other putative Class members.

102. Plaintiff has retained counsel with experience in litigating complex litigation and class actions to represent her and the Class, and Plaintiff will fairly and adequately represent the interests of the Class.

103. This action may properly be maintained as a class action because there is a well-defined

community of interest in the litigation and the proposed Class is ascertainable.

104.    Plaintiff does not know the number of members in the Class, however, on information and belief, the Class consists of thousands of individuals, making joinder of individual cases impracticable.

105.    Plaintiff's claims are typical of the claims of all other Class members.

106.    Plaintiff's claims and the Class members' claims are based on the same legal theories and arise from the same unlawful conduct, resulting in the same injury to Plaintiff and to all the other Class members.

107.    There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members.

108.    Plaintiff and the class she seeks to represent are similarly situated, have substantially similar agreements and pay provisions and are subject to Defendants common practices, policies or plans in violation of Louisiana and federal law.

109.    Plaintiff will fairly and adequately represent and protect the interests of the members of the class and subclasses. Plaintiff has retained counsel competent and experienced.

110.    Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the other Class members and have the financial resources to do so.

111.    Neither Plaintiff nor her counsel has any interests adverse to those of the other Class members.

112.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is impracticable and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

113. Even if every individual Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required.

114. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

115. By contrast, conducting this action as a class action will present fewer management difficulties, conserve the resources of the parties and the court system, and protect the rights of each Class member.

116. A class action will prevent the very real harm that would be suffered by numerous putative Class members who will be unable to enforce individual claims of this size on their own.

117. Plaintiff anticipates no difficulty in the management of this case as a class action.

118. The prosecution of separate actions by individual Class members may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to those adjudications, or that would otherwise substantially impair or impede the ability of those non-party Class members to protect their interests.

119. The prosecution of individual actions by Class members would establish inconsistent standards of conduct for Defendant.

120. Defendant has acted in ways generally applicable to the Class, thereby making appropriate final and injunctive relief or corresponding declaratory relief with regard to members of the Class as a whole.

121. The names and addresses of the Plaintiff putative class members are available through

Defendants. To the extent required by law, notice will be provided to the prospective class members via first class mail and/or by use of techniques in a form of notice that has been used customarily in collective actions, subject to court approval.

122.    Likewise, Defendants' conduct as described above is unlawful, is capable of repetition, and will continue unless restrained and enjoined by the Court.

## **FEDERAL CLAIMS**

COUNT I:
**PLAINTIFF'S RICO CLAIM AGAINST OWENS AND STEPHENS**
**18 U.S.C. § 1962(c)**

123.    The preceding paragraphs are incorporated herein as though fully set forth below.

124.    Upon information and belief, Owens and Stephens devised a multi-level scheme to defraud Plaintiff and Allstate Insurance Company.

125.    First, Owens and Stephens attempted to defraud Allstate of more money than what was necessary to repair Plaintiff's vehicle by overestimating the cost of repair and then communicating with Allstate for the purposes of negotiating the higher cost of the repair.

126.    Upon Allstate's refusal to pay over its estimated cost of repair, Owens and Stephens then attempted to defraud Plaintiff by requesting that she pay the higher cost of repair as fraudulently estimated by OCSC.

127.    Upon Plaintiff's refusal to pay more for her vehicle repair than estimated by Allstate, Owens and Stephens then attempted to defraud Plaintiff and/or Allstate by offering to perform an admittedly substandard "budget repair" on Plaintiff's vehicle for the entire amount of money offered by Allstate.

128.    Upon Plaintiff's refusal to allow OCSC to perform an admittedly substandard "budget repair" on her vehicle, Owens and Stephens fabricated invoices alleging Plaintiff owed OCSC

thousands of dollars for repairs and storage fees.

129.   Upon Plaintiff's refusal to pay for OCSC's fraudulent invoices, Owens and Stephens refused to return possession of the vehicle to Plaintiff.

130.   Upon information and belief, Owens and Stephens refuse to give Plaintiff possession of her vehicle to potentially assert a privilege under LSA-R.S. 9:4501, 9:4502 in the future for the purpose of selling Plaintiff's vehicle through one or more of the Owens Entities to satisfy OCSC's fraudulent invoice.

131.   Upon information and belief, Owens and Stephens have used and will continue to use the above described scheme to defraud other individuals like Plaintiff and other insurance companies like Allstate.

132.   The above described schemes are related in that they were undertaken by Owens and Stephens to increase the profits of OCSC through fraudulent actions.

133.   Similar schemes were hatched and executed for the other Class members.

134.   Each of the schemes concerning Plaintiff involve racketeering acts—violations of 18 U.S.C. §§ 1341 and 1343—which occurred over a known three-to-four-month period, and potentially, upon information and belief, as it relates to other occurrences, over the course several years. They form a "pattern" of racketeering required by 18 U.S.C. § 1961(5) and are believed to be ongoing.

135.   Owens and Stephens are RICO persons pursuant to § 1961(3). They committed the pattern of racketeering of mail and wire fraud described above.

136.   OCSC is a limited liability company that conducts business in Louisiana and throughout the nation (via communications with foreign insurance companies), and thus is a RICO enterprise pursuant to 18 U.S.C. § 1961(4). Through its sole-owner, Owens, and employee-

manager, Stephens, OCSC conducts its business across state lines via its communications and dealings with foreign insurance companies. All of the RICO violations were committed through OCSC by Owens and/or Stephens.

137. Therefore, Owens and Stephens violated 18 U.S.C. § 1962(c), which states, in pertinent part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

138. As a direct and proximate cause of Owens' and Stephens' pattern of racketeering, Plaintiff has been injured/harmed in the following ways:

    a. $8,000.00: The value of Ms. Gallmann's vehicle;

    b. $800.00: The cost of insurance on the vehicle for a six-month insurance policy;[2]

    c. $2,000.000: The cost of a down payment on a 2016 Toyota Rav-4;

    d. $318.00 per month: The cost of a monthly car note for the 2016 Toyota Rav-4;[3]

    e. $800.00: The cost of insurance on the 2016 Toyota Rav-4 for a six-month insurance policy;[4]

    f. The value of Ms. Gallmann's loss of use of the vehicle from January 29, 2018 until judgment is rendered in this case.

139. The Class has been similarly injured.

140. Accordingly, Plaintiff and the Class demand judgment be entered against Owens and Stephens, pursuant to 18 U.S.C. §1964(c), for Plaintiff's and the Class's damages, plus three

---

[2] Amount subject to increase so long as Defendants retain possession of Ms. Gallmann's vehicle.

[3] Amount subject to increase so long as Defendants retain possession of Ms. Gallmann's vehicle.

[4] Amount subject to increase so long as Defendants retain possession of Ms. Gallmann's vehicle.

times their damages, plus attorney's fees and costs and pre-judgment interest.

141.    Plaintiff hereby demands a jury trial.

COUNT II:
__PLAINTIFF'S RICO CONSPIRACY CLAIM AGAINST OWENS AND STEPHENS__
__18 U.S.C. §1962(d)__

142.    The preceding paragraphs are incorporated as though set forth below.

143.    In carrying out the pattern of racketeering detailed above, Owens and Stephens conspired amongst themselves and other employees of OCSC, who agreed with the objectives of these schemes and agreed to assist in carrying them out.

144.    Upon information and belief, Owens and Stephens conspired amongst themselves and other employees or agents of the Owens Entities, who agreed with the objectives of these schemes and agreed to assist in carrying them out.

145.    Therefore, Owens and Stephens have conspired to violate 18 U.S.C. §1962(c) by agreeing to the commission of a pattern of racketeering activity through the enterprise, OCSC, specifically and the remaining Owens Entities generally, in violation of 18 U.S.C. §1962(d).

146.    Owens and Stephens are jointly and severally liable for all damages to Plaintiff and the Class.

**STATE CLAIMS**

COUNT III:
CONVERSION

147.    The preceding paragraphs are incorporated as though set forth below.

148.    Owens', Stephens, and OCSC's actions towards Plaintiff as further detailed above are evidence that Defendants are withholding possession of Plaintiff's vehicle from Plaintiff and that Defendants have possibly altered or destroyed Plaintiff's vehicle without authorization from Plaintiff.

149.    Owens', Stephens, and OCSC's actions constitute an unlawful interference with Plaintiff's ownership and possession of her vehicle.

150.    Other members of the Class have also suffered the same loss.

151.    Owens, Stephens, and OCSC are therefore liable for the tort of conversion in an amount equal to the value of Plaintiff's vehicle.

152.    Alternatively, Plaintiff and the Class requests that Defendants be ordered to return all vehicles to Plaintiff and the Class and compensate Plaintiff and the Class for all damage to the vehicle caused by Defendants' conversion.

COUNT IV:
FRAUDULENT MISREPRESENTATION

153.    The preceding paragraphs are incorporated as though set forth below.

154.    Owens', Stephens', and OCSC's actions toward Plaintiff as further detailed above constitutes fraudulent misrepresentation under LSA-C.C. Art. 1953.

155.    Specifically, Defendants misrepresented the estimate to repair Plaintiff's vehicle with the intent to obtain more money than it would actually cost them to repair Plaintiff's vehicle.

156.    Defendants also misrepresented the status of the estimate of the vehicle with the intent to lengthen the amount of time that Defendants possessed Plaintiff's vehicle and obtain daily "storage fees" from Plaintiff for storing her vehicle.

157.    Defendants further misrepresented the nature and cost of repairs that Defendants allegedly performed on Plaintiff's vehicle.

158.    This scheme of misrepresentations is common to Defendants' business practices and was suffered by the Class.

159.    As a result of Defendants' fraudulent misrepresentations, Plaintiff and the Class have suffered damages including, but not limited to, the loss of value of Plaintiff's car and the loss

of use of Plaintiff's car.

COUNT V:<br>LOUISIANA UNFAIR TRADE PRACTICES ACT

160.   The preceding paragraphs are incorporated as though set forth below.

161.   Owens', Stephens', and OCSC's actions towards Plaintiff as further detailed above constitutes a violation of the Louisiana Unfair Trade Practices Act as the actions were fraudulent, deceptive, and unfair, and caused Plaintiff to lose an ascertainable amount of money, including, but not limited to, loss of value of her vehicle, loss of use of her vehicle, costs associated with purchasing the 2016 Toyota Rav-4, and all other related costs.

162.   Defendants, Owens, Stephens, and OCSC, are therefore liable to Plaintiff for actual damages, possibly treble damages, and reasonable attorney's fees.

**JURY REQUEST**

163.   For any and all claims subject to the same, a trial by jury is requested.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, individually and on behalf of all similarly situated, prays that after due proceedings be had, there be judgment in Plaintiff's favor:

a.   Certifying the Class and appointing named Plaintiff as representative of the Class, and appointing counsel for Plaintiff as lead counsel for the Class;

b.   Against Owens and Stephens pursuant to 18 U.S.C. § 1964(c) for Plaintiff's damages plus three times her damages, plus attorney's fees and costs and pre-judgment interest;

c.   Against Owens, Stephens, OCSC, and the remaining Owens Entities for conspiracy;

d.   Against Owens, Stephens, OCSC, and the remaining Owens Entities for damages caused by participating in racketeering activity;

e.   Against Owens, Stephens, and OCSC for damages caused by the conversion of

23

Plaintiff's property;

f.   Against Owens, Stephens, and OCSC for damages caused by their fraudulent misrepresentations;

g.   Against Owens, Stephens, and OCSC for their violations under LUTPA;

h.   All actual damages suffered by Plaintiff and each Class member;

i.   Treble damages for each Class member;

j.   Attorney's fees and court costs;

k.   Legal interest; and

l.   Any other claims that the facts above justify and that may be equitable.

Respectfully submitted,

*/s/ David P. Vicknair*
David P. Vicknair, #34135
Kassie Lee Richbourg, #37521
Bryce D. Cohen, #37076
Galen M. Hair, #32865
Sarah M. Kalis, #37186
**Scott, Vicknair, Hair & Checki, LLC**
909 Poydras Street, Suite 1100
New Orleans, Louisiana 70112
T: (504) 684-5200
F: (504) 613-6351
david@svhclaw.com
richbourg@svhclaw.com
bryce@svhclaw.com
hair@svhclaw.com
kalis@svhclaw.com

Dated: May 29, 2018